UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JAVONNA RETTEW, individually and as personal representative of the ESTATE OF THOMAS RETTEW; KRISTA MOSLEY, as the mother and first friend of K.R., a minor; and KENNETH TORRES, as guardian and next friend of R.R., a minor, | Case No. 1:20-cv-00386-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |
| Plaintiffs, | |
| v. | |
| CASSIA COUNTY, MINIDOKA COUNTY, MINI-CASSIA CRIMINAL JUSTICE CENTER, STEVE JENSEN, KEVIN DILLON, DAVID WELLS, DARWIN JOHNSON, LAINE MANSFIELD, REGINALD BALIOLA, DAVID HIRSCH, and JOHN DOES I - X, | |
| Defendants. | |

## INTRODUCTION

Thomas Rettew died while in the custody at the Mini-Cassia Criminal Justice Center after he swallowed a plastic baggie containing eight grams of methamphetamine and two grams of heroin immediately prior to his arrest.

Rettew's wife, Javonna Rettew, his Estate, the mother of his daughter, K.R., and the guardian of his son, R.R. brought this action against Cassia County, Minidoka County, Mini-Cassia Criminal Justice Center, and seven jail officers who encountered Rettew while he was detained. Plaintiffs allege violations of the Fourteenth Amendment, actionable under 42 U.S.C. § 1983, as well as *Monell* claims against Cassia County and Minidoka County, claiming Defendants were deliberately indifferent to Rettew's serious medical needs, which resulted in Rettew's death. Plaintiffs also bring various state law claims.

Before the Court are (1) Defendants Cassia County, Minidoka County, Mini-Cassia Criminal Justice Center, Kevin Dillon, David Wells, Laine Mansfield, Reginald Baliola, and "Jacob" Hirsch's ("County Defendants") Motion for Summary Judgment; and (2) Defendants Steve Jensen and Darwin Johnson's Motion for Summary Judgment (Dkt. 17). The Court heard oral argument on January 4, 2022, and now issues its decision. For the reasons explained below, the Court will dismiss Plaintiffs' state law claims with respect to all Defendants, grant the County Defendants' motion with respect to the section 1983 claims against Defendants Dillion, Baliola, Hirsch and deny the motion with respect to remaining County Defendants, and will deny Defendants Jensen and Johnson's motion with respect to the section 1983 claims.

**Memorandum Decision and Order - 2**

## BACKGROUND

On January 17, 2019, Thomas Rettew was arrested on outstanding warrants during a traffic stop. During the traffic stop and arrest, a struggle ensued, and Rettew fell to the ground resulting in his sustaining minor injuries, including a scraped left hand and knee. At some point immediately prior to or during the arrest, unbeknownst to the deputies, Rettew swallowed a plastic bagging containing approximately eight grams of methamphetamine; he had also placed an additional plastic bag with 0.2 grams of black tar heroin in his rectum. *Twin Falls Investigation*, Dkt. 23-1 at 12.

After the arrest, Rettew refused medical treatment for his scraped hand and was cleared by emergency medical services personnel. *Id.*, Dkt. 23-1 at 86. Rettew was then transported to the Mini-Cassia Criminal Justice Center (the "jail") in Burley, Idaho, arriving at about 5:50 p.m. Although Rettew had been combative during the arrest, he became "docile" on the transport drive to the jail. *Id.* Rettew arrived at the jail just as the day shift was ending and the night shift was beginning.

When Rettew arrived at the jail, which is administered jointly by Cassia County and Minidoka County, no medical staff remained on-site because,

according to County policy, medical staff only works on-site from 8:00 a.m. to 5:00 p.m., Monday through Friday. *Cassia County Dep.* 12:2-11; 15:1-17:22, Dkt. 23-10. An on-call nurse remains available for after-hours' questions 24 hours a day/seven days a week. *Id.* 18:12-20. Jail officers may also call an ambulance in an obvious medical emergency. *Id.*

### 1. The Day Shift

Three named defendants, Sergeant Jacob Hirsch, Deputy Kevin Dillon, and Deputy Reginald Baliola were working the day shift when Rettew arrived at the jail. Deputy Dillon had been serving dinner when Rettew arrived. Upon Rettew's arrival, Deputy Dillon took a break from the dinner service and conducted the intake search of Rettew and inventoried his property. *Dillion Dep. (Vol. I)* 18:1-7; *Dillion Dep. (Vol. II)* 38:11-18; 43:13-44:1, Dkt. 23-1. Although jail policy requires a strip search of detainees arrested on drug-related charges, Deputy Dillon did not book Rettew at this time and did not know the basis for Rettew's arrest; Deputy Dillon therefore did not conduct a strip search. *Id.* 38:11-18; 43:13-44:1.

When conducting the intake search, Deputy Dillon noticed a scrape on Rettew's left hand. Otherwise, Rettew appeared coherent but a little "down" from having just been arrested. *Dillion Dep. (Vol. I)* 20:6-21:2, Dkt. 23-1. Rettew also requested a blanket. *Id.* After completing the intake search, Deputy Dillon escorted Rettew to the booking counter and returned to serving dinner. *Twin Falls*

*Investigation,* Dkt. 23-1 at 12.  Not long after, Deputy Reginald Baliola saw Rettew at the booking counter speaking to a deputy there; Deputy Baliola noticed that Rettew appeared tired and was "nodding off" while talking to the deputy. *Twin Falls Investigation*, Dkt. 23-1 at 13. Deputy Baliola had heard that a "substance" had been found on Rettew at the time of his arrest, which they were testing and suspected might be drugs. *Baliola Dep.* 18:16-19:2.

At about 6:13 p.m., after Deputy Dillon completed the intake search, Deputy Baliola placed Rettew in a holding cell as he had not yet been booked. *Twin Falls Investigation*, Dkt. 23-1 at 13. Rettew was placed in the holding cell with another detainee, Alex Martinez. *Id.* Deputy Baliola gave them both food and blankets, as Rettew had told him he wanted food and had also requested a blanket. *Id.*, Dkt. 23-1 at 24. Deputy Baliola, who had encountered Rettew at the jail on several occasions, noticed nothing unusual about Rettew's demeanor or behavior, and Rettew did not tell Deputy Baliola that he had swallowed methamphetamine or that he otherwise required medical care. *Id.*

Deputy Baliola ended his shift at 7:00 p.m., as did Deputy Dillon. At the end of the deputies' shift, they attended the shift-change meeting led by the day-shift supervisor, Sergeant Jacob Hirsch. *Hirsch Dep.* 80:11-15, Dkt. 23-4. Sergeant Hirsch had been busy helping another inmate who had tried to hang himself with a

towel when Rettew arrived at the jail; Sergeant Hirsch therefore had no direct interaction with Rettew and only saw him from afar. Sergeant Hirsch recalled Rettew had been arrested by the drug task force, but when he saw Rettew, he did not notice "any abnormalities" in his behavior. *Id.* 85:24-89:7.

During the shift-change briefing, Sergeant Hirsch recalls reporting that a substance confiscated from Rettew was being tested, and the arresting officers might add drug charges. *Id.* 92:1-23. In an email Sergeant Hirsch sent at 6:50 p.m. to outgoing and incoming staff, he reported that there had been a "new incoming just recently," and he was "pretty scraped up" but had refused medical attention at the time of the arrest. Hirsch further reported, "Seems to be ok though shouldn't be a problem." *Twin Falls Investigation*, Dkt. 23-1 at 99. Sergeant Hirsch denies that he reported Rettew was "detoxing," or withdrawing from drugs, but acknowledges someone else might have said that during the shift-change briefing. *Hirsch Dep.* 92:5-21, Dkt. 23-4. Sergeant Hirsch's shift also ended at 7:00 p.m. No day-shift deputy performed a wellbeing check on Rettew after he was placed in the holding cell at approximately 6:15 p.m. despite jail policy requiring inmate checks at least every 25 minutes.

### 2. The Night Shift

The night shift came on duty at 7:00 p.m., comprising the four named defendants: Corporal David Wells, Deputy Darwin Johnson, Deputy Steve Jensen,

**Memorandum Decision and Order - 6**

and Deputy Laine Mansfield (now Laine Smith). As the transition from the day shift to the night shift was occurring, Rettew started to become restless at around 7:00 p.m. and vomited at about 7:05 p.m. *Twin Falls Investigation*, Dkt. 23-1 at 27 (Summary of Video Footage of Holding Cell #3). During this time to 7:45 p.m., the video footage shows Rettew noticeably shaking and his cellmate, Mr. Martinez covering him with a blanket and continuing to check on him. *Id.* Finally, at about 7:45 p.m., the video shows Mr. Martinez repeatedly banging on the cell door to get the deputies' attention. *Id.*

Finally noticing Mr. Martinez's banging on the cell door, Deputies Jensen and Mansfield conducted their first wellbeing check of Rettew at 7:51 p.m. *Jerome Investigation*, Dkt. 23-2 at 6-7. When Jensen and Mansfield checked on Rettew, they found him lying on the floor, groaning and shaking so much that Deputy Mansfield thought he was "seizing." *Id.*, Dkt. 23-2 at 6. Deputy Jensen tried to question Rettew, but Rettew only "groaned" or "gurgled" in response. *Id.*, Dkt. 23-2 at 7, 44. Deputy Jensen dismissed Rettew's symptoms as merely "detoxing" and radioed Corporal Wells to monitor him more closely through the camera. *Id.* Both Corporal Wells and Deputy Jensen knew "detoxing" or drug withdrawal can be fatal. *Wells Dep.* 44:24-45:2, Dkt. 23-6; *Jensen Dep.* 28:20-29:8, Dkt. 23-11.

As requested by Deputy Jensen, Corporal Wells began monitoring Rettew by camera from the control room. About ten minutes later at 8:06 p.m., Wells saw something on the video that concerned him enough that he radioed Jensen to check on Rettew. *Twin Falls Investigation*, Dkt. 23-1 at 44; *Jerome Investigation*, Dkt. 23-2 at 7. Deputy Jensen peered through the cell window and saw Rettew lying on his back on the concrete back, flailing his legs around and splashing them in the toilet, with his cellmate trying to stop him. *Id.* Upon seeing Rettew in this condition, Deputy Jensen realized that Rettew was detoxing "fairly heavy" and admitted that jail staff would typically call for medical assistance if an inmate appeared to be detoxing.  *Jerome Investigation*, Dkt. 23-2 at 44, 51.

Deputy Jensen did not call the nurse; instead, he radioed Wells to confirm Rettew was only detoxing and his cellmate was helping him keep his feet out of the toilet. *Twin Falls Investigation*, Dkt. 23-1 at 44. Wells laughed. *Id.*, Dkt. 23-1 at 37. Wells later admitted that he found Rettew's sticking his feet in the toilet to be alarming and "weird," but he did not even think about calling for medical assistance because "Jensen told him [Rettew] was alright and that Martinez was keeping an eye on him for us." *Jerome Investigation*, Dkt. 23-2 at 31. Wells stated he thought it was a "good thing" Martinez was in the cell with Rettew or "they would have lost Rettew a lot sooner." *Id.*

**Memorandum Decision and Order - 8**

Over the next hour Rettew continued to display behavior "very much" more erratic than on prior occasions when he came in high or detoxing. *Wells Dep.* 73:2-5, Dkt. 23-6.  During this time, Rettew remained lying on the floor and exhibited symptoms that included sweating, groaning, vomiting, shaking uncontrollably, spinning around the floor, yelling, and hallucinating. *Twin Falls Investigation*, Dkt. 23-1 at 25, 28 44; *Smith Dep*. 33:8-25; 36:5-37-16; 42:5-43:13, Dkt. 23-8. At 8:38 p.m., the video footage shows Rettew sitting up and vomiting on the blankets, and, at 8:44 p.m., Rettew begins yelling and hitting his head on the wall "as a result of lack of muscular control." *Twin Falls Investigation*, Dkt. 23-1 at 28, 45. Corporal Wells admitted he knew this wasn't Rettew's normal detox. *Wells Dep.* 94:21-95:2. Dkt. 23-6. By 8:45 p.m., even Deputy Jensen remarked that Rettew was "detoxing hard." *Twin Falls Investigation*, Dkt. 23-1 at 25.

At 8:58 p.m., Deputy Johnson checked on Rettew for the first time, commenting that he better go check on the "tweaker." *Jerome Investigation*, Dkt. 23-2 at 8. When Deputy Johnson checked on Rettew, the video footage showed that Rettew "is on the floor on his back with his knee bent up toward his chest" and his "hands are on his chest with a pained look on his face." *Jerome Investigation*, Dkt. 23-2 at 8. Johnson did not open the door. *Id.* Johnson knew that an inmate

detoxing required closer monitoring, and that alcohol withdrawal, at least, can be fatal, *Johnson Dep.* 52:14-25, Dkt. 23-7.

Shortly after 9:00 p.m., Deputy Mansfield checked on Rettew. *Jerome Investigation*, Dkt. 23-2 at 8.  The video footage shows Rettew in the fetal position, writhing and flailing on the ground, eyes closed and possibly hallucinating. *Video 2*, 9:03:33.326-9:04:46.064 PM. The video further shows Deputy Mansfield speaking with Rettew's cellmate, Martinez, who is lying on concrete bench, shirtless, because Martinez had used his shirt to apply a cool compress to Rettew's head. From this exchange, Deputy Mansfield learned that Rettew had recently vomited into the blankets, and she had Martinez throw the dirty blankets into the hall. *Id.* Deputy Mansfield returned with clean blankets. *Id.* When she checked on Rettew minutes later, at 9:06 p.m., the video footage shows Rettew lying on his back on the concrete floor, with his eyes closed and barely moving. *Video 3*, 9:06:26.184-9:06:58.766 PM. The video then shows Mansfield talking to Martinez and Martinez's throwing his shirt out in the hall. Mansfield closes the door and leaves. *Id.*

The deputies continued to monitor Rettew through the camera and physically check on him through the cell door, and, at about 9:27 p.m., Rettew began spasming and convulsing, hitting his head on the floor. *Jerome*

**Memorandum Decision and Order - 10**

*Investigation*, Dkt. 23-2 at 8 (Summary of Video Footage of Holding Cell #3). Deputy Jensen then checked on Rettew at 9:31 p.m. through the cell window. Although Rettew appeared to be seizing, Deputy Jensen walked away. *Id.* Deputy Johnson then checked on Rettew two minutes later, and Rettew still appeared to be seizing on the concrete floor. *Id.* Deputy Johnson walked away. *Id.*

About ten minutes later, at 9:41 p.m., Deputy Johnson returned and removed Mr. Martinez from the cell. He called Deputy Jensen and brought in a mattress for Rettew. *Id.* Once Deputy Jensen arrived at 9:42 p.m., he and Deputy Johnson began attending to Rettew with Deputy Mansfield nearby. *Id.*, Dkt. 23-2 at 9. Rettew was face down, and there was blood and saliva on the floor around his head, which Johnson and Jensen sopped up. It appeared the blood was coming from Rettew's mouth and a cut on his head. *Jensen Dep.*, 79:21-80:11. Rettew became unresponsive, and another deputy, who happened to walk by Rettew's cell, instructed Deputy Johnson to call an ambulance, which Deputy Johnson did. *Jerome Investigation*, Dkt. 23-2 at 9. The deputies started cardiopulmonary resuscitation efforts until emergency services arrived and transported to Rettew to the hospital. *Id.*, Dkt. 23-2 at 11-13.

When Rettew arrived at the hospital, his condition was listed as critical. Despite attempts to save his life, Rettew unfortunately died on the evening of

January 17, 2021, from Acute Methamphetamine Toxicity. The postmortem

toxicology performed on Rettew's femoral blood showed the highest fatal levels of

methamphetamines documented in the medical literature. *Robin Decl.* ¶ 9.

Defendants' expert, Dr. Robin, opines no reasonable medical intervention could

have reversed the course of the overdose and saved Rettew's life by the time

Rettew began to reach peak absorption of the drugs at approximately 9:00 p.m.

*Robin Decl.* ¶¶ 17-19, Dkt. 17-4. Plaintiffs' expert, Dr. Gulick, opines that

"possibly by 2120 and definitely 2146 hours, Mr. Rettew was beyond possible

interventions to save his life from the methamphetamine overdose." *Gulick*

*Rebuttal Report*, Dkt. 25 at 12.

## LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any

claim or defense, "there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of

the principal purposes of summary judgment "is to isolate and dispose of factually

unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is

"not a disfavored procedural shortcut," but is instead the "principal tool[ ] by

which factually insufficient claims or defenses [can] be isolated and prevented

from going to trial with the attendant unwarranted consumption of public and

private resources." *Id.* at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to any material fact – a fact "that may affect the outcome of the case." *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in their favor. *Devereaux*, 263 F.3d at 1076. The

non-moving party must go beyond the pleadings and show by "affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quotation omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

## ANALYSIS

### 1. Fourteenth Amendment Denial of Medical Care

Plaintiffs allege the Individual Defendants violated Rettew's rights under the Fourteenth Amendment by failing to summon medical care in the face of a serious medical need. "Pretrial detainees in state custody have a constitutional right to adequate medical treatment under the Fourteenth Amendment." *J. K. J. v. City of San Diego*, 17 F.4th 1247, 1256 (9th Cir. 2021) (quoting *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 667 (9th Cir. 2021) (internal quotation marks omitted). To maintain a Fourteenth Amendment claim based on inadequate medical care, pretrial detainees must show "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the pre-trial detainee's medical need and the nature of the defendant's response to that need. *Id.* The plaintiff "must first show a serious medical need by demonstrating that failure to treat [the plaintiff's] condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 785 (9th Cir. 2019) (internal quotations marks and citations omitted). Upon demonstration of a serious medical need, the plaintiff must then show that the defendant's response was objectively deliberately indifferent. *Id.* at 786.

The Ninth Circuit recently enumerated the objective deliberate indifference components as:

> (1) the defendant made an intentional decision regarding the denial of medical care; (2) those conditions put the detainee at substantial risk of suffering serious harm; (3) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (4) by not taking such measures, the defendant caused the detainee's injuries.

*Sandoval*, 985 F.3d at 669. To satisfy the third element, Plaintiffs must show that the defendant's actions were "objectively unreasonable" – a test that necessarily turns on the facts and circumstances of each case. *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1067-68 (9th Cir. 2016) (en banc).

**Memorandum Decision and Order - 15**

The objective unreasonableness standard requires a showing of "more than negligence but less than subjective intent—something akin to reckless disregard." *Sandoval*, 985 F.3d at 669 (quoting *Gordon*, 888 F.3d at 1125). "The mere lack of due care by a state official does not deprive an individual of life, liberty, or property under the Fourteenth Amendment." *Gordon*, 888 F.3d at 1125 (citations and quotations omitted). "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473 (2015); *see also J. K. J.*, 17 F.4th at 1257.

### A. Day-Shift Officers: Dillon, Baliola, and Hirsch

The Court will first consider the claims against the three individual defendants who worked the day shift before Rettew's death that same night. Sergeant Jacob Hirsch and Deputies Dillon and Baliola all worked the day shift the night Rettew died. When Rettew arrived at the jail until end of the day shift, Rettew appeared cooperative and coherent, if a little "tired." He even requested food, which Deputy Baliola provided to him, along with a blanket. During the period between Deputy Baliola's placing Rettew in a holding cell and the end of the day shift, both Deputy Baliola and Deputy Dillon failed to check on Rettew, which violated jail policy. But Rettew only started to become "restless" around

7:00 p.m. after Sergeant Hirsch and Deputies Dillon and Baliola had already clocked off.

None of these facts establish objective deliberate indifference akin to reckless disregard by these officers.  As noted, these officers' conduct must be judged from the position of an officer in the same circumstances, "including what the officer knew at the time, not with 20/20 vision of hindsight," and their conduct must be akin to reckless disregard. *J.K.J.*, 17 F.4th at 1257 (quoting *Kingsley*, 135 S.Ct. at 2473). Hindsight now tells us that Rettew ingested a large amount of methamphetamine; but the law does not permit the Court to "project that knowledge backwards in time based on how this story ended" given the facts available to Hirsch, Dillon, and Baliola. *Id.* To these officers' knowledge, Rettew appeared "tired" but was otherwise cooperative and coherent. At most, construing the facts in a light most favorable to Plaintiffs, had the deputies checked on Rettew between 6:16 p.m., when Deputy Baliola dropped off the food and blankets, to the end of their shift at 7:00 p.m., they would have seen him "moving about restless" under his blankets. *Gulick Report*, Dkt. 25 at 8. Such symptoms – fatigue and restlessness – would not lead a reasonable officer to understand that Rettew faced a "substantial risk of suffering serious harm" if he did not receive immediate medical care.

Plaintiffs also insist that the day-shift officers acted with deliberate indifference by failing to perform "an initial risk assessment of Rettew for drug withdrawal or abuse" and failing to perform a strip search, which would have revealed the heroin in Rettew's rectum "and led to further inquiry into whether he had ingest[ed] anything." *Pl's Resp.*, pp. 5-8, Dkt. 22.  Plaintiffs further fault Sergeant Hirsch, as the shift supervisor, for "failing to pass along his information regarding Rettew's history of and present drug intoxication and its potential fatality." *Id.* at 8. Even if such conduct amounted to a constitutional violation, which the Court seriously questions, Plaintiffs point to no evidence connecting this conduct to Rettew's death.

First, the evidence demonstrates that the night deputies thought Rettew was "detoxing" and that the night-shift deputies knew of Rettew's history of drug abuse and withdrawal – specifically while in police custody; thus, even if Hirsch had "passed this information along," there is no evidence to suggest this would have changed the outcome.

Even less evidence exists suggesting that a strip search, which would have revealed the heroin in Rettew's rectum, would have led to further inquiry into whether Rettew had ingested anything – and that inquiry would have revealed Rettew had ingested eight grams of methamphetamine. Plaintiffs describe Rettew's

death as "slow" and "horrific." *Pls' SOF* ¶ 17. Yet, during the three to four hours leading up to his death Rettew never revealed to a single deputy that he had swallowed methamphetamine. Given these facts, Plaintiffs give no reason, other than sheer speculation, that an initial risk assessment and strip search would have led these day-shift officers to discover that Rettew had ingested a lethal dose of methamphetamine, resulting in a different end to this tragic story.

"Liability under § 1983 must be based on the personal involvement of the defendant." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir.1998). "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). Plaintiffs have failed to show that any of the day-shift officers' acts or omissions resulted in a constitutional deprivation that led to Rettew's death. The claims against Defendants Hirsch, Dillion, and Baliola must therefore be dismissed.

### B. Deliberate Indifference: Mansfield, Wells, Johnson, and Jensen

Plaintiffs also allege that the four individual defendants, Corporal Wells and Deputies Mansfield, Johnson, and Jensen,[1] violated Rettew's rights under the Fourteenth Amendment by acting with deliberate indifference to Rettew's serious medical need. Although nothing transpired before the end of the day shift to suggest Rettew was in obvious medical distress or that he needed medical attention, Rettew's condition began to deteriorate markedly throughout the evening. Each of these night-shift officers observed Rettew's worsening symptoms at some point during the evening, and all were on shift when Rettew ultimately went into cardiac arrest. Thus, whether a reasonable deputy in the same circumstances as these officers would have understood Rettew faced a substantial risk of suffering serious harm without immediate medical care presents a much closer question.

In defending the night-shift officers' actions, Defendants contend that the symptoms Rettew began exhibiting after the day-shift ended – vomiting, sweating, shaking, writhing around and hitting his head against the floor, sticking his feet in

---

[1]      Defendant Jensen and Defendant Johnson were terminated as a result of the events of January 17, 2019. They argue that their termination "is a remedial measure and therefore is inadmissible evidence*." Defs' Jensen and Johnson's Opening Br.*, p. 19, Dkt. 18-2. The Court did not consider their terminations in deciding the merits of their motion for summary judgment.

**Memorandum Decision and Order - 20**

the toilet, hallucinating, and moaning – "were consistent with an inmate detoxing from opiates," and a "reasonable deputy would not have known that there was a substantial risk that Rettew was facing a serious medical need from a lethal ingestion of methamphetamine." *County Defs' Reply*, Dkt. 28 at 6. As the night-shift officers were unaware that Rettew had ingested a lethal dose of drugs, Defendants argue, they "cannot be liable for any alleged failure to respond to a serious medical need." *Id.*; *Johnson and Jensen Defs' Opening Br.*, Dkt. 18-2 at 6.

This argument misses the point – the dispositive inquiry for objective deliberate indifference is not whether a reasonable officer in the same circumstances would have divined Rettew swallowed a plastic baggie with a lethal dose of methamphetamine. Rather, the critical question is whether a reasonable detention deputy observing Rettew's symptoms would have recognized that Rettew faced a substantial risk of suffering serious harm if he did not receive medical care – even if the precise nature of what was ailing Rettew was unclear or misunderstood. *Sandoval*, 985 F.3d at 669; *see also J. K. J.*, 17 F.4th at 1257 ("But whether…Taub and Durbin should have known that Jenkins was overdosing*, or otherwise known that she had a serious medical need*, is precisely the question.") (emphasis added). Simply put, a reasonable belief that Rettew was detoxing instead of overdosing cannot save the night-shift deputies from liability if a reasonable

officer otherwise would have recognized the high degree of risk involved – regardless of its cause – and would have taken reasonable measures to abate that risk.

Defendants' argument is flawed for an additional reason: it ignores detoxing is a serious medical need. "Withdrawal is a serious and potentially deadly medical condition, with symptoms including seizures, hallucinations, agitation and increased blood pressure." *Hernandez v. Cty. of Monterey*, 110 F. Supp. 3d 929, 948 (N.D. Cal. 2015). "Detoxing" or withdrawal from opiates therefore "constitutes a serious medical need requiring appropriate medical care." *Villarreal v. Cty. of Monterey*, 254 F. Supp. 3d 1168, 1184 (N.D. Cal. 2017); *see also Hernandez*, 110 F. Supp. 3d at 948; *Foelker v. Outagamie Cty.*, 394 F.3d 510, 513 (7th Cir. 2005) (finding opiate withdrawal amounts to a serious medical need); *Gonzalez v. Cecil Cty.*, 221 F.Supp.2d 611, 616 (D. Md. 2002) (finding heroin withdrawal is a serious medical need). Thus, the night-deputies' failure to summon medical care – even though they thought Rettew was detoxing instead of overdosing – "may constitute deliberate indifference to a serious healthcare need." *Villarreal*, 254 F. Supp. 3d at 1184 (internal quotation marks and citation omitted).

For this reason, this case is unlike *J.K.J*, where the Ninth Circuit held the plaintiffs' complaint did not plausibly allege objective deliberate indifference

based on the arresting officers' failure to recognize that the pre-trial detainee had a serious medical need arising from her overdosing. *J.K.J.*, 17 F.4th at 1258. In that case, the detainee was arrested on outstanding warrants during a traffic stop. Unbeknownst to the officers, the detainee had swallowed some drugs immediately prior to her arrest. Inside the police cruiser while waiting to be transported to the jail, the detainee vomited. The officers immediately called an ambulance and asked the detainee whether she was "detoxing" or "withdrawing," and she responded no, explaining she was sick, her stomach was turning, and she was pregnant. *Id.* at 1252. The detainee also denied having ingested any drugs in response to the officers' asking her directly whether she had eaten "something" because they wanted to make sure she was "gonna be ok." *Id.* The officers therefore cancelled the ambulance, but the detainee eventually became unresponsive an hour later, at which point the officers called another ambulance. It was too late, however, and the detainee died from on overdose.

Based on these allegations, the Ninth Circuit found that the officers' conduct in failing to recognize, sooner than they did, that the detainee had a serious medical need "was not objectively unreasonable, in light of [the detainee's] prior statements—including her alternative explanations for having vomited, her denial

that she had ingested anything, and her insistence that she did not want to go to jail." *Id.* at 1258 (citation and quotation marks omitted).

In this case, the night-shift officers admit they thought Rettew was detoxing, which the Ninth Circuit has held constitutes a serious medical need. This admission by the night-shift officers distinguishes this case from *J.K.J.*, where the arresting officers thought the detainee was pregnant, and casts serious doubt on the night-shift deputies' claim that they did not behave with objective deliberate indifference in failing to recognize, sooner than they did, that Rettew had a serious medical need. Indeed, when the officers in *J.K.J.* thought the detainee might be detoxing after she vomited, those officers called an ambulance. They only cancelled the first ambulance because the detainee denied she was detoxing, denied she had ingested any drugs, and said she was pregnant. Here, by contrast, the night-shift deputies had no plausible explanation for Rettew's symptoms other than a condition that constitutes a serious medical need. Yet, they did nothing to help Rettew until it was too late. With this point in my mind, the Court will consider the merits of the night-shift officers' motions for summary judgment.

### *(1) Deliberate Indifference*

As an initial matter, it cannot be disputed that each of the night-shift officers made an intentional decision with respect to the conditions under which Rettew was confined—specifically each of their decisions not to summon medical care at

any point before Rettew became unresponsive and stopped breathing. As the Ninth Circuit explained in *Castro*, nothing more than this decision to refrain from acting is required, so long as nothing renders the officer incapable of acting, such as "having just suffered an accident or sudden illness that rendered him unconscious." 833 F.3d at 1070. Nothing in the record suggests that these officers failed to call the on-call nurse or otherwise summon medical care because some condition rendered them incapable of acting. The first element is therefore satisfied.

The real issues here pertain to the second and third elements: (1) whether a reasonable detention officer observing Rettew's condition would have understood Rettew faced a "substantial risk of suffering serious harm," and (2) whether the night-shift officers' decision not to summon medical care at any point before Rettew stopped breathing was "objectively unreasonable." *Sandoval*, 985 F.3d at 670. As already explained, to be objectively unreasonable, the each of the night-shift deputies' conduct must be judged from the position of a reasonable detention deputy in the same circumstances and their conduct must be akin to reckless disregard. *Id.*

### a. Wells

Beginning with Wells, considering the evidence in a light most favorable to Plaintiffs, a jury could conclude that a reasonable detention deputy in the same circumstances as Wells would have understood that Rettew faced a substantial risk

of suffering serious harm if he did not receive medical attention. Wells was the night-shift supervisor on the night Rettew died, and the ultimate decision to call the nurse or an ambulance rested with him. Wells' duties that night included monitoring the video feeds from holding cell monitors in the control room. He was informed by Jensen that Rettew was "detoxing" and told to monitor Rettew more closely for this reason. Wells knew that withdrawing from drugs can be fatal. Moreover, while observing Rettew through the cameras, Wells saw Rettew lying and spinning on the floor and putting his feet in the toilet, which Wells admitted was "weird." Wells also admitted that Rettew was behaving "very much" more erratically than on prior occasions when Rettew had come in high or detoxing from methamphetamine. Yet, Wells did not call the nurse to ask for medical advice or take any other measures to ensure Rettew was safe – instead he relied on Rettew's cellmate to "keep an eye" on Rettew. Even when he saw Rettew convulsing on the floor and bleeding, he did not call for medical assistance.

This evidence is more than sufficient for a jury to conclude that Wells should have understood the high degree of risk involved if Rettew did not receive medical care. In *Sandoval*, the Ninth Circuit held that "a jury could conclude that a reasonable nurse who was told that [the inmate] was shaking, tired, and disoriented—and who was specifically directed by a deputy to evaluate [the

inmate] "more thoroughly"—would have understood that [the inmate] faced a "substantial risk of suffering serious harm." *Sandoval*, 985 F.3d at 670. Although Wells is not a nurse, given the seriousness of Rettew's symptoms, a jury could conclude that a reasonable officer would do more than rely on Rettew's cellmate "to keep an eye on him." *Sandoval*, 985 F.3d at 670.

### b. Jensen

Jensen observed Rettew suffer many of the same symptoms as Wells did. Jensen performed the first wellcheck of Rettew at 7:51 p.m. – notably only in response to Rettew's cellmate banging on the door to get someone's attention to help Rettew – and saw Rettew lying on the floor shaking and unable to speak coherently. Jensen dismissed Rettew's symptoms as merely detoxing, but Jensen knew drug withdrawal can be fatal. He then checked on Rettew about fifteen minutes later, at Wells' request, and saw him spinning on the floor and putting his feet on the toilet. Jensen admitted he thought Rettew was detoxing "fairly heavy" at this point and, at 8:45 p.m., was overheard saying that Rettew was "detoxing hard." Yet, Jensen did not radio Wells to call for medical assistance or do so himself, claiming that seeking medical help was discouraged because of budget concerns. Jensen only acted to help Rettew after Rettew was convulsing, bleeding from his mouth and head, and unresponsive.

A delay in providing medical treatment can sustain a "deliberate indifference" claim, where the delay has exacerbated the prisoner's injury or unnecessarily prolonged the inmate's pain. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (noting indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment). Here, a jury could conclude that Jensen's deliberate delay showed a deliberate disregard to Rettew's obvious medical distress as early as Jensen's first check on Rettew when Rettew could not stand or respond verbally and was sweating, shaking, and groaning.

### c. *Mansfield*

For similar reasons, the Court reaches the same conclusion for the claims against Deputy Mansfield. When Mansfield, along with Jensen, first checked on Rettew, she thought he was seizing. As she continued to check on him, she saw that continued to sweat and shake uncontrollably and looked very sick. She also testified that Rettew appeared to be hallucinating, and a little after 9:00 p.m., she brought him four extra blankets because he had just vomited and appeared very unwell. At this time, the video footage shows that Rettew was shaking and writhing around on the ground.

Although Mansfield was the least experienced of the deputies on duty that night and maintains she did not have the authority to summon medical care for Rettew, this did not absolve her of her constitutional duty not to act with deliberate

indifference to Rettew's medical needs – she could have reported what she observed regarding Rettew's condition to Wells and recommended that the on-call nurse, at least, be called. Viewing this evidence in a light most favorable to Plaintiffs, a jury could therefore conclude that Mansfield acted with deliberate indifference akin to reckless disregard by essentially doing nothing in the face of what appeared to be an obvious medical emergency.

### d.  Johnson

Plaintiffs also create a question of fact as to whether Johnson acted with deliberate indifference. In his report immediately following Rettew's death, Johnson reported that he heard Rettew was detoxing at the shift-change briefing and knew that jail policy required that the floor deputies check on Rettew every 15 minutes. In addition, Johnson heard Jensen tell Wells that Rettew needed to be monitored more closely. But Johnson did not physically check on Rettew until 8:58 p.m., at which time Rettew was curled up on the floor with a "pained" expression on his face. Johnson walked away. The record further shows that Johnson checked on Rettew again at 9:33 p.m., and Rettew appeared to be seizing. Johnson once again walked away. Johnson came back about ten minutes later with a mattress and called Martinez out of the cell to go to booking. Johnson and Jensen noticed blood and saliva around Rettew's head, and they started cleaning it up. Rettew was not moving. Johnson and Jensen then rolled Rettew onto the mattress, but Rettew was

unresponsive. Rettew continued to be unresponsive for nearly fifteen minutes, but Johnson did not radio Wells to call for an ambulance until another deputy checked on Rettew and said that an ambulance was needed.

From this evidence, a jury could conclude that a reasonable deputy in Johnson's circumstances would have understood that Rettew faced a substantial risk of suffering serious harm if he did not receive immediate medical care, and that Johnson's actions in waiting until Rettew stopped breathing to radio Wells and request medical assistance was objectively unreasonable.

### (2) Causation

To the extent the night-shift deputies argue a reasonable deputy would not have inferred Rettew was facing a serious medical need until it was already too late to save Rettew's life, Plaintiff's expert, Dr. Gulick, opined "that possibly by 2120 and definitely 2146 hours, Rettew was beyond possible interventions to save his life from the methamphetamine overdose." *Gulick's Rebuttal Report*, Dkt. 25 at 12. Implicit in this statement is that Rettew could have been saved prior to this time with appropriate medical care. Crediting Dr. Gulick's opinion, a jury could conclude that Rettew would not have died but for Wells, Mansfield, and Jensen's delay in summoning medical care.

Deputy Johnson presents a more complicated question because he did not observe any of Rettew's symptoms until 8:58 p.m., and Johnson did not personally

observe Rettew's sweating, vomiting, shaking, and hallucinating, and other unusually erratic behavior prior to this time. Johnson, however, stated he had heard Rettew was detoxing and knew Rettew required close monitoring when he checked on him at 8:58 p.m. When Johnson checked on Rettew, Rettew was curled up on the floor, looking pained. Although a close question, a jury could conclude from this evidence that a reasonable deputy would have recognized that Rettew was in obvious medical distress and required medical attention at this time. This is enough to create a question of fact on the issue of causation with respect to Johnson as well.

### C. Qualified Immunity

 "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To determine whether an officer is entitled to qualified immunity, the court considers: (1) whether there has been a violation of a constitutional right; and (2) whether the officers' conduct violated "clearly established" federal law. *See Sharp v. Cnty. of Orange*, 871 F.3d 901, 909 (9th Cir. 2016).

As discussed above, the Court has concluded that no disputed issues of fact exist that support the claims against Defendants Dillon, Baliola, and Hirsch. But,

as the preceding analysis makes clear, whether the night-shift officers violated a constitutional right remains an open question for the jury, and Defendants Wells, Mansfield, Jensen, and Johnson cannot be granted summary judgment on that basis. Instead, the Court must proceed to the second step of the qualified immunity inquiry, or whether "the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood [their] conduct to be unlawful." *Id*.

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates it." *Rico v. Ducart*, 980 F.3d 1292, 1298 (9th Cir. 2020) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). "The plaintiff bears the burden to show that the contours of the right were clearly established." *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1109 (9th Cir. 2011).

In January 2019, it was "clearly established that officers could not intentionally deny or delay access to medical care." *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) (citing *Estelle*, 429 U.S. at 104–05); *see also Sandoval*,

985 F.3d at 679; *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). In *Sandoval*,

the Ninth Circuit analyzed cases, all decided before 2019, where prison officials

denied, delayed, or intentionally interfered with needed medical treatment. 985

F.3d at 680. It articulated the rule from these cases as follows: "a prison official

who is aware that an inmate is suffering from a serious acute medical condition

violates the Constitution when he stands idly by rather than responding with

reasonable diligence to treat the condition." *Id.*

A jury could conclude that the delay and denial of medical care here fell

within the category of conduct prohibited by *Clement v. Gomez* and its progeny.

Viewing the evidence in a light most favorable to Plaintiffs, the night-shift officers

thought Rettew was detoxing, a serious medical need. When the night-shift

deputies first checked on him at 7:51 p.m. but was lying on the floor, shaking so

hard he appeared to be seizing, and could only respond to questions with "groans"

and "gurgles." His condition quickly devolved throughout the evening to writhing

and spinning on the floor, hallucinating, vomiting, and other erratic behavior. Yet,

the night-shift officers did nothing to help Rettew until he became unresponsive

and stopped breathing.

Although Plaintiffs do not cite a case squarely on all fours with this case, the

night-shift deputies are not entitled to qualified immunity "simply because the very

action in question has [not] previously been held unlawful." *Sandoval*, 985 F.3d at 680 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation marks omitted). "State officials can still be on notice that their conduct violates established law even in novel factual circumstances—i.e., even without a prior case that had 'fundamentally similar' or 'materially similar' facts." *Sandoval*, 985 F.3d at 680 (quoting *Wilk v. Neven*, 956 F.3d 1143, 1147 (9th Cir. 2020) (internal quotation marks omitted). "A reasonable officer would know that it is unlawful for officers to delay medical treatment for an inmate with obvious signs of medical distress." *Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 863 (8th Cir. 2006)

Indeed, as noted in *Sandoval*, the Ninth Circuit has found violations in less severe circumstances: "If it is a constitutional violation to delay treatment for four hours for inmates exposed to pepper spray, *Clement*, 298 F.3d at 905, or to fail to promptly set a fractured thumb, *Jett*, 439 F.3d at 1097–98—neither of which are potentially life-threatening conditions—the same must be true for failing to provide any meaningful treatment to an inmate who was sweating and appeared so tired and disoriented that a deputy urged that he be re-evaluated." *Sandoval*, 985 F.3d at 680. The case for deliberate indifference is at least as strong here as in *Clement* and *Jett*. The night-shift officers, Defendants Wells, Mansfield, Jensen, and Johnson are therefore not entitled to qualified immunity.

### 2. Municipal Liability

"A municipality or governmental entity cannot be found liable under section 1983 on a respondeat superior theory." *Cabrales v. Cty. of Los Angeles*, 864 F.2d 1454, 1460 (9th Cir. 1988), cert. granted, judgment vacated, 490 U.S. 1087 (1989), and opinion reinstated, 886 F.2d 235 (9th Cir. 1989). "Rather, such liability can be imposed only for injuries inflicted pursuant to a governmental 'policy or custom.'" *Id.* (quoting *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978). In addition, the plaintiff must establish "an affirmative link between the policy or custom and the particular constitutional violation alleged." – the alleged policy or custom must be the "moving force" behind the alleged constitutional violation to establish liability under section 1983. *Id.* (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985). "Though proof of a single incident is insufficient to establish a custom or policy, liability may be predicated on one violation if it can be shown that the violation was a product of an unconstitutional policy or custom." *Id.* at 160-61 (citations omitted).

"Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 536 U.S. 51, 61 (2011). Absent a formal governmental policy, a plaintiff must show a "longstanding practice or custom which constitutes the standard operating

procedure of the local governmental entity." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). "[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997) (citing *Monell*, 436 U.S. at 690-91). However, liability of an allegedly improper custom or policy may not be predicated upon isolated or sporadic events; rather, "it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino*, 99 F.3d at 918 (citations omitted).

"Such a policy may be shown by demonstrating that the County…manifested a 'deliberate indifference' to the medical needs of the inmates at the jail." *Id.* For purposes of County liability under *Monell,* chronic understaffing may constitute a "policy."  *Est. of Prasad ex rel. Prasad v. Cty. of Sutter*, 958 F. Supp. 2d 1101, 1115 (E.D. Cal. 2013). "In addition, a "policy" may also include a policy of "inaction," such as failure to train. *Id.* (citing *Waggy v. Spokane Cnty. Wash*., 594 F.3d 707, 713 (9th Cir. 2010)).

### A.  Inadequate Staffing

Here, Plaintiffs contend that Cassia County and Minidoka County (collectively, "the Counties") maintained an official policy of keeping the jail

understaffed and with inadequate medical personnel and further failed to train the

nonmedical staff to recognize and properly respond to common medical

emergencies. Specifically, Plaintiffs allege that the Counties maintained "an

official policy of providing on-site medical staff for little more than one-quarter of

any given week," and this "absence from the jail of medical staff for 73% of each

week floor shifted the burden of medical care to the typical 4 deputies present at

the jail on the night shift," which Plaintiffs contend was "woefully inadequate for

the number of inmates." *Pls' Resp. Br.* pp. 14, 15, Dkt. 22.  According to Plaintiffs,

"the counties' deliberate, chronic underfunding and understaffing of the jail

rendered an eventual death by overdose inevitable." *Pls. Resp. to County Defs'*

*Mot.*, p. 14, Dkt. 22.

Plaintiffs establish that the Counties declined requests for more staffing

despite repeated requests for five additional deputies for each shift.  Plaintiffs fail,

however, to establish direct causation on this claim based solely on the failure to

staff more deputies to monitor inmates. Plaintiffs' argument that more deputies to

monitor inmates would have prevented Rettew's death is entirely speculative.

Plaintiffs does not explain how more deputies would have changed the outcome,

and they do not provide evidence or argument that the lack of adequate staffing

caused Rettew's death. The night-shift officers checked on Rettew on multiple

occasions but never called for medical assistance before Rettew became unresponsive and stopped breathing. The record supports that there are questions of fact whether the deliberate indifference of these officers caused Rettew's death, not a lack of staff generally.

### B. *Failure to Train*

Plaintiffs also fail to establish *Monell* liability based on a failure to train theory. Plaintiffs contend that the Counties had a custom or practice of failing to train non-medical jail staff on how to recognize and properly respond to drug withdrawal or overdose so jail staff would know when to call for medical assistance. But even recognizing that a failure to train can be a "policy" under *Monell*," Plaintiffs submit no evidence that the "deficiency in training actually caused the police officers' indifference to [Rettew's] medical needs." *City of Canton v. Harris*, 489 U.S. 378, 391 (1989). The record demonstrates that jail staff thought Rettew was detoxing, and Jensen and Wells, at the very least, understood that drug withdrawal could be fatal – and Jensen stated in his interview with the investigators that they would typically call the nurse if an inmate appeared to be detoxing. *Jerome Investigation*, Dkt. 23-2 at 51. This evidence suggests "the moving force behind the alleged constitutional violation was not failure to train, but the officers' failure to heed their training." *J.K.J.* 17 F.4th at 1256.

Accordingly, the Counties are entitled to summary judgment on Plaintiffs' failure to train theory.

### C. Ratification

Plaintiffs' ratification theory of *Monell* liability is equally unavailing. A plaintiff may also establish a claim under *Monell* if an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it. *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004); *Hammond v. County of Madera*, 859 F.2d 797, 801–02 (9th Cir.1988). Ratification forms the basis of municipal liability only when "the officials involved adopted and expressly approved of the acts of others who caused the constitutional violation." *Trevino*, 99 F.3d at 920.

Here, however, the evidence does not support a finding of ratification by the Counties. Following Rettew's death, two independent investigations were conducted. Following the receipt of the reports from the investigations, the Counties determined that various employees had not acted in accordance with jail policy in their response to Rettew and further decided to terminate the employment of Deputies Jensen and Johnson and to demote Corporal Wells. These actions do not amount to ratification of the conduct of jail deputies but instead show that the jail investigated the incident and took the remedial measures they deemed

appropriate. Plaintiffs therefore may not proceed to the jury on their ratification theory of *Monell* liability.

### D.  Custom or Practice

But Plaintiffs' *Monell* claim is not lost entirely. Plaintiffs have also submitted evidence that a "culture" or "unwritten rule" existed in the jail discouraging jail staff from calling "medical too often because they didn't want to pay overtime or not call the ambulance if you don't have to be of not wanting—the county not wanting to pay the bill." *Hirsch Dep.* 56:13-20, Dkt. 23-4; *Jensen Dep.* 39:21-40:16, Dkt. 23-11. Viewing the evidence in a light most favorable to Plaintiff, a jury could conclude that this "culture" or "unwritten rule" of discouraging the deputies from calling for medical assistance after hours, coupled with the official policy of only maintaining on-site medical staff from 8:00 a.m. to 5:00 p.m., Monday through Friday, effectively foreclosed the inmates' ability to make their medical needs known to the medical staff, and this amounted to deliberate indifference. *Cabrales*, 864 F.2d at 1461 ("Prison or jail officials show deliberate indifference to serious medical needs if prisoners are unable to make their medical needs known to the medical staff."). A jury could further find that this alleged custom or practice of not summoning medical assistance after hours, which resulted in effectively denying inmates access to medical care, was a

substantial factor in causing Rettew's death. Plaintiffs therefore may proceed on their *Monell* claims against the Counties on this theory.

### 3. State Law Claims

#### A. County Defendants

It is unclear whether Plaintiffs assert state law claims against the County Defendants. Plaintiffs, however, failed to present any argument concerning their state law claims in their opposition to the County Defendants' summary judgment motion. It is a general rule that a party cannot revisit theories that it raises but abandons at summary judgment.'" *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1026 (9th Cir. 2009) (quoting *Davis v. City of Law Vegas*, 478 F.3d 1048, 1058 (9th Cir. 2007) (quoting *BankAmerica Pension Plan v. McMath*, 206 F.3d 821, 826 (9th Cir. 2000)). "'A party abandons an issue when it has a full and fair opportunity to ventilate its views with respect to an issue and instead chooses a position that removes the issue from the case.'" *Id.* (quoting *McMath*, 206 F.3d at 826). Because Plaintiffs have failed to present any argument in opposition to the County Defendants' motion for summary judgment on the state law claims, they have abandoned those claims with respect to the County Defendants.

## B. *Johnson and Jensen*

Plaintiffs appear to continue to assert state law claims for wrongful death against Defendants Jensen and Johnson, however. As explained below, Jensen and Johnson are immune from liability for Plaintiffs' wrongful death claim under the Idaho Torts Claims Act, and insufficient evidence exists for Plaintiffs' conspiracy claim to proceed past summary judgment.

### (1) *Wrongful Death*

Plaintiffs claim that they are entitled to recover damages pursuant to Idaho Code § 5-311, which allows the heirs of a person whose death is caused "by the wrongful act or neglect of another" to "maintain an action for damages against the person causing the death." The Idaho Tort Claims Act ("ITCA") further "establishes that governmental entities are subject to liability for their own negligent or wrongful acts, and those of their employees who were acting within the course and scope of their employment." *Hoffer v. City of Boise*, 257 P.3d 1226, 1228 (Idaho 2011). The ITCA expressly exempts certain causes of action, however. Specifically, it provides that so long as a governmental entity and its employees is "acting without malice or criminal intent," they will not be liable for claims arising out of "performance or the failure to exercise or perform a discretionary function," Idaho Code § 6-904(1), or arising out of the "providing or

failing to provide medical care to a prisoner or person in the custody of any city, county or state jail, detention center or correctional facility." *Id.* § 6-904B.

Here, Plaintiffs have not alleged any facts that would support a finding that Jenson or Johnson acted with malice or criminal intent. As used in the ITCA, criminal intent means the "intentional commission of what the person knows to be a crime." *James v. City of Boise*, 376 P.3d 33, 51 (Idaho 2016). In addition, malice means, "the intentional commission of a wrongful or unlawful act, without legal justification or excuse *and with ill will*, whether or not injury was intended." *Anderson v. City of Pocatello*, 731 P.2d 171, 182–183 (Idaho 1987) (emphasis in the original). For the purposes of the ITCA, "it shall be a rebuttable presumption that any act or omission of an employee within the time and at the place of his employment is within the course and scope of his employment and without malice or criminal intent." Idaho Code § 6-903(5); *see also Miller v. Idaho State Patrol*, 252 P.3d 1274, 1288 (Idaho 2011) (explaining that the burden is on the plaintiff to show that the defendant acted maliciously or with criminal intent).

Plaintiffs submit no evidence to rebut the presumption that Johnson or Jensen acted without malice or criminal intent. Plaintiffs produce no evidence that Johnson or Jensen's alleged deliberate indifference amounted to a criminal act. Nor do they submit evidence or argument to rebut the presumption that Johnson or

Jensen acted without malice, which in the context of the ITCA connotes "ill will."
*Anderson*, 731 P.2d at 182-83. It is true Plaintiffs have submitted evidence that
make the question of whether Jensen and Johnson actions in responding to
Rettew's serious medical need were objectively unreasonable an issue of fact for
the jury. But Plaintiffs fail to produce any evidence from which a jury could
reasonably infer *ill will* on the part of the officers. "In the face of this record,
[Plaintiffs were] not entitled to rest upon the allegation of malice in [their]
pleadings but [were] required to set forth specific facts showing that there is a
genuine issue for trial." *Id.* at 183. Having failed in this regard, Plaintiffs' tort
claim against Johnson and Jensen is dismissed.

### (2) *Conspiracy*

Plaintiffs also allege in their Complaint that Defendant knew "Mr. Rettew
was in serious medical need by virtue of recent illicit drug ingestion, yet they all
falsely denied such knowledge or otherwise deliberately withheld it from investors
[sic] and/or investigative reports, except defendants Wells and Johnson." *Compl.* ¶
34, Dkt. 1. Plaintiffs further claim that "[w]ith the possible exception of defendants
Wells and/or Johnson, the defendants, and each of them, individually and/or acting
in concert, with knowledge of a potential lawsuit arising from their constitutional
violations alleged above, wrongfully destroyed, concealed, and/or falsified
evidence in order to disrupt or defeat the potential lawsuit." *Compl.*, ¶ 43, Dkt. 1.

"A civil conspiracy that gives rise to legal remedies exists only if there is an agreement between two or more to accomplish an unlawful objective or to accomplish a lawful objective in an unlawful manner." *Taylor v. McNichols*, 149 Idaho 826, 844, 243 P.3d 642, 660 (2010) (quoting *Mannos v. Moss*, 143 Idaho 927, 935, 155 P.3d 1166, 1174 (2007)). "Civil conspiracy is not, by itself, a claim for relief." *Id.* "The essence of a cause of action for civil conspiracy is the civil wrong committed as the objective of the conspiracy, not the conspiracy itself." *Id.* "In addition, an agreement is the foundation of a conspiracy charge and there must be some showing of specific evidence of a plan or agreement to defraud to demonstrate the pendency of the conspiracy at the time the alleged fraud occurred." *Id.* (internal quotation marks and brackets omitted).

Here, Plaintiffs fail to submit any evidence that Johnson and Jensen – or any defendant – acted in concert to falsify evidence. Indeed, Plaintiffs' Complaint specifically excepts Johnson from any conspiracy. In support of their supposed claim that Johnson and Jensen acted in concert to falsify evidence, Plaintiffs contend that Defendants' "own statements contradict their current claim of ignorance," citing to portions of their depositions where they admit to knowing that sometimes drug withdrawals can be fatal. *Pls' Resp. to Johnson and Jensen Mot.*, p. 12, Dkt. 29. This is neither evidence of falsifying evidence nor of a conspiracy.

At most, Plaintiffs submits testimony from Jensen that he made a mistake in his original report when he stated that Sergeant Hirsch said at the shift-change briefing that Rettew was detoxing. This again is not evidence of a conspiracy or falsifying evidence. Plaintiffs' civil conspiracy claim against Johnson and Jensen is accordingly dismissed.

## ORDER

**IT IS ORDERED that:**

1. Defendants Cassia County, Minidoka County, Mini-Cassia Criminal Justice Center, Kevin Dillon, David Wells, Laine Mansfield, Reginald Baliola, and "Jacob" Hirsch's Motion for Summary Judgment is GRANTED in part and DENIED in part as indicated above.

2. Defendants Steve Jensen and Darwin Johnson's Motion for Summary Judgment (Dkt. 17) is GRANTED in part and DENIED in part, as indicated above.

DATED: March 3, 2022

B. Lynn Winmill
U.S. District Court Judge